[Civil No. 2866.   Filed December 23, 1930.]

[294 Pac. 285.]

THE SOUTHERN CASUALTY COMPANY, a Corporation, Appellant, v. WILLIAM H. HUGHES, Appellee.

Messrs. Sutter & Roche, for Appellant.

Mr. Frank E. Thomas, for Appellee.

McALISTER, J.—William H. Hughes brought an action against the Southern Casualty Company, a corporation, to recover $5,000 on a contract of insurance alleged to have been entered into on or about August 23d, 1923, and from a judgment in his favor

for the full amount asked for the defendant has appealed.

The case is before the court a second time, the decision in the former appeal being reported in 33 Ariz. 206, 263 Pac. 584. The pleadings and the evidence are practically the same as in that proceeding. The complaint has not been changed and the answer raises all the defenses it did then, except those attacking the sufficiency of the complaint, and also some new ones which it is not necessary to state.

The action then, as now, was based upon an oral contract of insurance and it was held that an insurance company, though it fails to comply with the provisions of the statute requiring it to file copies of the forms of its policies which must include certain provisions and exclude others, "may not set up in defense that it was not authorized by law to make such contract" when sued for damages upon one made by it which has been fully performed by the other party. Thereupon, the sufficiency of the evidence to show that the contract sued on had been either entered into or later ratified by the defendant was considered, the question having been raised by an assignment based upon the court's refusal to direct a verdict for defendant, and the record in that appeal disclosed that if such contract did become binding upon the company this result followed from the subsequent ratification by it of the acts of its representative in Bisbee, one I. W. Wallace, in making it.

It further appeared, however, that Wallace was merely an agent with power to solicit business, take applications and collect premiums, but without any authority whatever to issue policies, and that the court, notwithstanding this fact, instructed the jury that an insurance agent having these powers could bind the company by his oral agreement to insure where the insured pays the premium to the agent

at or about that time and causes the successive monthly installments of premium called for by the contract to be paid. This instruction was held erroneous since a mere soliciting agent has no power to bind an insurance company even though it accepts the premium, unless it has knowledge, either express or implied, of the agreement, and it is not chargeable with knowledge acquired by its agent in matters not within the scope of his authority.

Under this state of the record it was clear that there was nothing to advise the court whether the jury reached its verdict as a result of this instruction or because it believed the insurance company had ratified the oral agreement. Hence, the case was remanded for a new trial, and the record of that proceeding, which is now before us for review, discloses that this erroneous instruction was not given, but that the question whether the company ratified the alleged oral agreement prior to the accident was again submitted, and a proper disposition of the case, as we view it, requires only a consideration of the question of ratification. To determine whether the court's action in placing it before the jury finds support in the record it is well to state briefly the facts relied on to constitute the alleged oral contract of insurance and necessary to set forth those claimed to show ratification of it.

It appears that plaintiff and one William Shields were partners in a mining lease in the Warren district, and that in August, 1923, they took in two partners, F. N. Merrill and John Charon, who were operating a lease near theirs. After agreeing to consolidate their leases the four partners, according to the plaintiff, dropped into the office of Wallace one afternoon to sign a working agreement, and while there the question of insurance came up. They had decided that they themselves should be insured against accident, and one of them said to Wallace

that they wanted protection. He told them he could insure them, and after explaining the policy he could offer them stated, in answer to the inquiry of one of the partners whether all of them would be covered, that all would be except the foreman, Hughes, who thereupon remarked that he also wanted protection for himself and family, and that he would "go out and get some," or, as one witness put it, "go up the street and get accident insurance." Wallace, according to plaintiff, then said: "If you go strong enough I can insure you. You pay me one hundred dollars and six per cent a month on the payroll, five dollars a day, for five thousand dollars." When asked by one of the partners if he could do that, Wallace replied that he could. The proposition was accepted, and he then told Hughes that he would be covered when he went to work the following morning.

Instead of issuing two new policies Wallace suggested, inasmuch as it would be a saving to them, that a policy that had been theretofore issued by the defendant in the name of Hughes and Shields on property they had worked out be transferred to Hughes, and that one known as the "Banks-Jones lease," which had been posted with Wallace for sale and transfer and was on property that had been worked out and shut down, be transferred to Shields. This was agreed to, the transfer to Hughes being made on August 2, 1923, and the one to Shields on October 2, 1923. Upon receiving the policies from Phoenix, properly assigned, Wallace delivered them to the partners, and on the date of their expiration they were renewed, the Shields policy on November 8, 1923, in his name, and the Hughes policy on September 7, 1923, in his name. One of the policies insured Hughes and the other Shields "against loss from the liability imposed by law upon the assured for damages on account of bodily injuries or death at any time resulting therefrom suf-

fered, or alleged to have been suffered, as the result of an accident occurring while this policy is in force by any employee or employees of the assured.''

To protect the partners it was necessary, so Wallace informed them, that they be carried on the time-book as employees, and he directed them to keep two time-books, one for each policy or piece of ground, and on the Hughes time-book to carry as employees Shields, Merrill, Charon and any others they wished to, and on the Shields time-book, Hughes and such others as they desired. These directions were complied with, but in his letter to the Barr Agency of Phoenix, the general agents of the defendant company in Arizona, asking it to transfer the policies, Wallace failed to notify it of any of these facts. He merely requested attaching an indorsement on one policy changing it to read ''Wm. Hughes'' instead of ''Shields and Hughes'' as written, and one on the other so that it would read ''Wm. Shields'' in the place of ''Banks-Jones,'' the policies to remain the same in all other respects. And in the monthly reports of the pay-rolls of Shields and of Hughes furnished the defendant after that for the purpose of advising it of the amount due under the six per cent. clause of their policies the names of none of their employees appeared, but only the total of their wages and the six per cent. thereof calculated.

Premiums were paid only on two policies and wholly from partnership moneys, the plaintiff having made no advances therefor from his individual funds.

On November 14, 1923, while these policies were in effect an accident occurred on the property operated by the partners in which plaintiff lost the sight of both eyes, and three employees, Zed Prater, one Escalante and one Valencia, were injured. Shields as employer reported the accident to the defendant and the four injured men demanded compensation of it, Shields signing each demand as witness. The

defendant paid Escalante and Valencia $21.12 each, and Prater $1,800, following the filing by him of an action against the four partners for $4,000. In settlement of the claim of plaintiff the defendant tendered him, on November 23, 1923, a check for $34.72, not then knowing, according to the testimony of the manager of the Barr Agency, that he was one of the partners and not an employee of Shields, but he refused it. Two months later the defendant wrote Shields stating that it had canceled the policy standing in his name upon the ground that the partnership and not Shields was the real party insured, and that Hughes was a member of the partnership and not an employee thereof, facts it had no notice of when the policy was issued.

Thereafter the plaintiff filed suit against the defendant and in his complaint alleged:

"That on or about the 23d day of August, 1923, the plaintiff and defendant for a valuable consideration then expressed as hereinafter stated, entered into an oral agreement or contract for the insurance of the plaintiff from that date for the period of 1 year, and as evidence of said insurance thereby the defendant agreed with the plaintiff to issue to him an accident policy in writing and therein and thereby to protect him to the extent of $5,000 against death or any accident or injury to his person while engaged in the business of operating and working in such mine, as expressed and agreed to in said oral agreement or contract. That the plaintiff relying upon said oral agreement or contract of insurance, and the defendant did insure and intended to insure the plaintiff, and the plaintiff thereupon paid to the defendant one hundred dollars in cash as demanded by the defendant and as he had agreed to do, and also paid to the defendant an additional sum, being a premium assessment of 6 per cent. per month as theretofore agreed, on a basis of $5 per day, being the daily wages as agreed by the plaintiff and defendant in said oral agreement or contract. . . . That the defendant has wholly failed to issue plaintiff

said policy or any policy as it has so agreed as afore-
said.''

In the trial the plaintiff did not contend, nor does
it here, that the defendant was. advised, when it is-
sued the policy in the name of Shields, of the facts
it assigned for canceling it or of the existence of
an oral contract insuring plaintiff against accident
to himself, but he took the position, as he does now,
that it learned of these later though prior to the
accident, and 'that its act in retaining the premiums
already paid without repudiating the contract made
by its agent after gaining this knowledge constitutes
a ratification. Before it may be held that the de-
fendant ratified the oral contract of insurance it
must of course be true that it knew before the plain-
tiff was injured that it had been entered into, and
the testimony as to when the incident relied on to
give this information occurred, namely, the check
by defendant's auditor, W. G. Flay, of the policies
in the name of Shields and of Hughes, and the time-
books in connection therewith, is decidedly conflict-
ing. That in behalf of plaintiff places it about three
weeks prior to the accident and that in behalf of
defendant two months subsequent thereto. However,
the jury's verdict for the plaintiff shows that it ac-
cepted his version of the proposition, and since there
is sufficient evidence to support this finding the case
must be disposed of on the theory that it is true.

It appears that Flay went to Bisbee to check,
among others, the policies that its agent there, Mr.
Wallace, had written for William Shields and Will-
iam Hughes and the pay-rolls in connection there-
with and that upon arrival he called upon Mr. Wal-
lace and informed him that he had come to make this
audit and Wallace directed him where to reach their
property. He found William Shields there and asked
him for the records in which they kept the time or

names of the employees of the lease and Shields handed him one of the time-books in which he saw the names of four men. He then told Shields he did not want that book but the time-book of the men working on the lease whereupon John Charon, who was standing near, took from a joist back of and above Flay and handed to him another time-book which he audited.

According to Charon, Flay came to the mine where he was running a hoist, keeping the books and doing the work generally on top and called for the time-books, which were given him. He said nothing to Flay other than to tell him that the books handed him were the time-books. One of them was a monthly time-book and in it appeared the names of the four copartners and the other was a weekly time-book in which appeared the names of the employees. Flay went over them, thanked the witness and left.

There was no further conversation concerning the time-books and none whatever concerning the policies, except that Flay, in line with his testimony that he made the audit on January 12, 1924, testified that Shields told him there had been an accident and they would have a claim against the company, that one of the partners, a Mr. Hughes, had been hurt, and was expected to lose the sight of one eye. Flay testified that he reported this to the defendant.

The sufficiency of these facts to show that Wallace orally agreed to insure plaintiff against accident to his person, or that the defendant, if the facts be held sufficient for this purpose, ever ratified the agreement, was raised by a motion for a directed verdict, which the trial court denied. This ruling forms the basis for the first and only assignment it is necessary to consider.

That Wallace orally agreed to insure plaintiff personally against accident and that his principal, the

defendant, instead issued a policy insuring him against loss on account of accidental injury suffered by his employees were undoubtedly accepted by the jury as true, but whether the evidence sustained these findings is immaterial in view of the fact that even though Wallace did make such an agreement and the premium thereon was paid by plaintiff, either individually or by the partnership for him, there is nothing in the record to show that the defendant had any knowledge whatever of it prior to the accident. In fact, it is not claimed that the company was advised of its existence prior to the date of the audit made by Flay, but reliance is had wholly upon that examination as giving it this information. Just what was said or done by Shields or Charon while Flay was making the audit that could have given him such knowledge is not pointed out. There was nothing in the language used by either of them that even suggested it and the time-books examined by Flay contained nothing that tended in the slightest degree to disclose it. The names of the four employees working for Shields, including the plaintiff, with their time appeared in the weekly time-book, and the names of Shields, Merrill and Charon as employees of Hughes with their time appeared in the monthly time-book. It is plain, therefore, that Flay could only have ascertained from this examination that Wallace had agreed to insure plaintiff against any loss he might sustain on account of accident to his employees who were, according to one of the time-books, Shields, Merrill and Charon, and Shields against any loss he might sustain on account of accident to his employees, one of whom, the other time-book disclosed, was the plaintiff, and neither of them against accident to himself. This being true it follows necessarily that there could have been no ratification, and, therefore, no liability on the part of defendant, for it is elementary that a principal may

be held liable for the unauthorized acts of his agent on the theory of ratification only when he knows the facts and acts in the light of such knowledge. 21 R. C. L. 928. The most that may be said for these facts is that if this were an action by Shields against the defendant under the policy insuring him against loss resulting from an accident to his employee, Hughes, they might be held to have given Flay knowledge of the fact that Hughes was not an employee of Shields but a partner and, hence, to have constituted a ratification by the defendant of the agreement, provided, of course, it retained after gaining such knowledge the premium already paid.

It follows that defendant's motion for a directed verdict should have been granted.

It is regrettable that the plaintiff should ascertain only after he has been seriously injured that he did not have protection, because he and his three partners made an effort to procure it through I. W. Wallace, and while they apparently had some misgivings as to his being able to give them accident insurance in the manner he suggested their doubt was completely dispelled by his asurances that he could. Just why he should have so advised them in the face of the fact that defendant was not authorized to write such insurance in Arizona and of the further fact that he could have accomplished it, if at all, only by having one of the partners pretend he individually was the employer and the one to be protected his employee, does not appear. He must have known that such an agreement would not bind his principal unless it had knowledge thereof and agreed to it and that its enforcement in case of accident even then would depend wholly upon the attitude of Shields who could sue or not as he saw fit. Under these circumstances he was solely responsible for the plaintiff's lack of protection and the latter should have proceeded against him in

an action for damages instead of the company which was wholly unadvised prior to the accident of his unauthorized act.

The court has no alternative other than to enter judgment for the defendant.

The judgment is reversed and the cause remanded, with direction to dismiss it.

LOCKWOOD, C. J., and ROSS, J., concur.